Our statute in regard to the examination of persons accused of crimes, and the English statute from which it was borrowed, are supposed by some writers to be innovations upon the common law. Whether this opinion is well founded or not, it is agreed on all hands that, in order to render the examination of the person charged admissible as evidence, the requirements of the statute must be substantially complied with, and that any departure *Page 46 
calculated to prejudice the accused will be sufficient to exclude it from consideration. The declaration must be without oath, uninfluenced by threats or promises, and, as a preliminary, the party must be apprised that he is free to speak or be silent. It is quite unnecessary to vindicate the humanity and justice of these provisions. When an individual is charged with a specific offence, he is apprised by the form of proceeding, not only that he is suspected, but that there is legal proof to justify that suspicion, which he is called upon to combat or explain. He is placed in the attitude of a defendant, and as he could not by the rules of the common law, in a civil suit, be permitted or compelled to testify, it would be singular if he did not enjoy an equal immunity in a criminal prosecution, when his liberty or life was involved in the issue.
In prohibiting the magistrate from administering an oath, the statute follows the common law in analogous cases. The prohibition is the result of the relation sustained by the accused to the prosecution as a defendant, and not at all because an admission under oath is involuntary, or because it is not entitled to the same or greater credit than one obtained without that sanction. The permission granted to interrogate a person thus circumstanced, when his answers could only be used as evidence against him, was, as has been suggested, a departure from the strict rule of the common law, and the legislature has, with great propriety, sought to prevent the abuse of the power by making it the duty of the magistrate to inform the defendant that he is at liberty to refuse an answer to any question. As the prisoner is subjected to a new ordeal, he is prepared for the trial by a previous warning that it can only take place at his election. It is obvious that the exemption of the defendant from an examination on oath, and the duty imposed upon the examining officer, arising, as they do, from the relation which the former sustains to the prosecution and the express provisions of the statute, can have no application where those relations *Page 47 
are different, and where the individual is thrown upon the common law exclusively for his protection against self-crimination. Hence, when called as a witness, either in a civil suit or criminal prosecution, his deposition has always been held admissible against him. (2 Stark. Ev., 1, 27, 7th ed.; Rex v.Wheater, 2 Moody C.C., 45; 2 Stark. Ev., 37, pt. 1, 7thed.; Rosc. Cr. Ev., 45.) It makes no difference whether the deponent has been suspected, or whether he may have been called to testify to the corpus of the offence for which he was subsequently put on trial. There is nothing in the relation in which the witness stands to the cause or parties from which the law can imply suspicion or guilt. He is presumed innocent as well as indifferent, and compelled to testify. The exception to the general rule is, that he is not obliged to depose to any fact that may tend to criminate himself. This is his privilege — a defence provided by the law, but which he must assume for himself. He cannot be warned of a danger by others, the knowledge of which in all cases is supposed to be, and in nine cases out of ten is in fact, confined to the witness. If he chooses to testify, what he says is evidence against him in all cases and all courts where he is properly a party. The notion that because he is sworn his deposition is not voluntary, is simply absurd. He has the privilege to speak or be silent. If he elects to answer, the oath binds him to speak the truth. If this is moral coercion, moral freedom consists in the liberty of lying unnecessarily with impunity.
In Wheater's case (supra), the defendant had been charged with forgery before the lord mayor, but had been discharged for want of sufficient evidence. He had therefore been suspected and charged with the offence. He was then examined before the commissioners in bankruptcy touching the bills against his father, on whom the forgery had been committed. He was informed of his rights, and objected to certain questions, and was compelled to answer them notwithstanding his objections. He was subsequently indicted *Page 48 
for the forgery, and his deposition was received, although COLERIDGE, J., before whom the trial was had, doubted as to its admissibility, and the point was reserved for the consideration of the judges. The question was argued in 1838 before all the judges, with the exception of PARK and GURNEY; and all, with two exceptions, concurred in the opinion that the evidence was properly received. This case establishes that a sworn statement made by a witness in a cause between other parties, is voluntary; second, that it is not invalidated by the circumstance that the witness had been suspected or even charged with a crime arising out of the transactions in relation to which his testimony was given. It is true that the defendant was apprised of his privilege, but no stress seems to have been laid upon that fact in the decision, nor do I perceive how it could legitimately have affected the result.
The case before us belongs to a third class, differing in some respects from both of those to which I have adverted. Hendrickson was called, sworn, and testified before the coroner's jury, without warning as to his privilege, and without objection on his part. If on that occasion he occupied the position of a person accused of a crime, or a defendant, his situation would be similar to that of a person before an examining magistrate; and although the tribunal might be different, yet, upon principle, his rights should be the same in both cases. If, however, he was but a witness, and in no just sense a party, his statement was rightfully received in evidence. In the first place, the proceedings before the coroner were a mere inquest of office. Their object was to ascertain the cause of the death of Mrs. Hendrickson. They did not presuppose that a crime had been committed by any one, or that any suspicion to that effect existed. The inquiry would have been just as legitimate if the decedent had come to her death by disease or accident, or by her own hand, as by the act or procurement of another. If, in the prosecution of the inquiry into the circumstances occasioning her death *Page 49 
it had appeared that a crime had been committed and that the defendant was the criminal, the jury might have found the fact, and it would have been the duty of the coroner to commit him for trial. But the exercise of this authority would be a consequence of the inquisition, and not the object for which the inquiry was instituted. (1 Tomlin's Law Dic., 432.) From the time that a felonious homicide was established, the proceedings would assume the form of an inquiry before a grand jury. It appears affirmatively in this case that the prisoner was the first witness examined; that he was requested to give an account how the death occurred, and made his statement accordingly. The verdict of the jury is not given, nor any more of the proceedings than merely to show that he was sworn and interrogated, and that his answers were received on the trial. I think we must assume that as he was subpœnaed, sworn, and testified as a witness, he preserved that character throughout. If the coroner had, at any time prior to the verdict, assumed to act as an examining magistrate upon any charge against the defendant founded on the testimony elicited upon the inquest, or otherwise, that fact should have been stated. The statement made by him, therefore, as a witness, was rightfully submitted to the jury. The coroner did not apprise him of his privilege; such an intimation in some cases would be an act of humanity, in others an insult. It is sufficient that the law has imposed no such duty upon any one but an examining magistrate, which in this case the coroner was not.
I have not adverted to the nisi prius decisions in England, because they are irreconcilable with each other. In the case ofThe Queen v. Owen (9 Carr. Payne, 83), indicted for rape, a deposition taken before a coroner's jury was admitted in evidence. Where, however, the defendants were on trial for murder, the same deposition was rejected by a different judge. Baron GURNEY, who presided on the last trial, said that he could not see the distinction between *Page 50 Wheater's case and others in principle; and he does not allude to or seem to be aware of the fact that the decision of COLERIDGE, J., at the circuit, had been affirmed by the fifteen judges. There is no distinction in principle; and the weight of authority in England is in favor of the reception of the evidence.
The second exception, and the only other one argued, presents, to my mind, a question of more difficulty. The will of the father of the deceased was offered in evidence by the prosecution, objected to as irrelevant by the prisoner, and admitted by the judge; it was read to the jury, and the counsel for the defendant then moved to strike out the evidence for irrelevancy, and the motion was denied. To these several rulings exceptions were duly taken.
The will devised all the property of the testator to his wife for life, and at her death one-half to his son, the other moiety to be equally divided between his two daughters, of whom Mrs. Hendrickson was one. Conceding that great latitude of inquiry is admitted, in cases of murder, as to all circumstances calculated to influence the conduct of the accused, still there must be some limit; and the one prescribed by common sense would seem to be, that the fact proved, either alone or in connection with other evidence given or offered, should tend to establish the matter in issue. There certainly is no obvious connection between the will of the testator and the murder of his daughter. If it presented a motive for the commission of the offence, it must be because the defendant would gain by the death of the decedent, or because he was dissatisfied with the disposition made of the property of the testator. The first hypothesis is inadmissible, because the prisoner might gain if he and his wife survived her mother; an advantage which would be lost in case of her death during the continuance of the life interest of the latter. In regard to the second, it cannot avail the prosecution, because there was not a semblance of proof that any dissatisfaction existed. The prisoner and his wife *Page 51 
were placed upon precisely the same footing as her sister Hungerford and her husband; and there is neither evidence nor any probability that the prisoner expected that his father-in-law would discriminate in his favor in the disposition of his estate. The people proposed, in a previous stage of the trial, to show the dissatisfaction of the prisoner, by his own declarations, but no such evidence was given; and the jury were left, therefore, to assume this fact, and then infer from it a motive to murder his wife because her father had dealt less liberally with him than he had anticipated. STARKIE remarks that, "as the very foundation of indirect proof is the establishment of one or more facts from which the inference is sought to be made, the law requires that the latter should be established by direct evidence, in the same manner as if they were the very facts in issue." There can be no pretence that this has been done in the present case, and I am of the opinion that the exception must be allowed, and for that reason a new trial ordered.
ALLEN, J., also dissented, on the ground that there was error in admitting in evidence the statements of the defendant before the coroner.
Judgment affirmed.